**SO ORDERED.**

**SIGNED this 9th day of May, 2017.**



_____
Robert E. Nugent
United States Bankruptcy Judge

PUBLISHED

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANASAS

| | |
|---|---|
| IN RE: | |
| **NATHAN EDWARD HOLMAN** | Case No. 11-13418 |
| **SHALA RENEE HOLMAN** | Chapter 13 |
| Debtors. | |

### MEMORANDUM OPINION

The Court "may" dismiss a chapter 13 case for "cause," including unreasonable delay, material default under a confirmed plan, and bad faith.[1] But once the debtor completes all payments under the plan, the Court "shall" grant the debtor a discharge.[2] In this case, the debtors violated both their plan and confirmation order. They flouted their duties to the Trustee, the Government, and the Court throughout

---

[1] 11 U.S.C. § 1307(c)(1) and (c)(6). All statutory references are to the Bankruptcy Code, Title 11, U.S.C., as amended.
[2] § 1328(a).

1

the case. Even after the Trustee's and the United States' motions to dismiss were pending, the debtors continued to run afoul of the confirmation order. Yet the debtors completed their payments before the trial on these motions. Despite there being ample cause to convert or dismiss their case, § 1328(a) requires the Court to instead grant the debtors a discharge and deny the Trustee's and the United States' motions as moot.[3]

Facts

Shala and Nathan Holman filed this case on November 3, 2011. Nathan was and is a self-employed chiropractor. Shala was a physician's assistant who dabbled in multilevel marketing on the side. They proposed a chapter 13 plan that provided for them to make 60 monthly payments of $707. Under the plan, they would surrender their late model Mercedes Benz and their boat, strip off a $212,494 second mortgage on their homestead, and retain their 2009 Volkswagen.[4] On June 28, 2012, the Court entered an agreed order confirming their plan as modified ("Confirmation

---

[3] Two trials occurred in this case. The first, on October 13, 2015 was on the debtors' fourth motion to modify their confirmed plan and the Trustee's first motion to dismiss. Doc. 168. The day before this first trial, debtors filed a fifth motion to modify. The fourth and fifth modifications were resolved by agreement and approved by the Court on December 2, 2015. Doc. 180 (Agreed Order). Then, when debtors defaulted under the Agreed Order, the Trustee filed a second motion to dismiss on July 26, 2016 and that motion, as twice amended, together with the IRS's motion to dismiss filed August 23, 2016, came on for trial on March 22, 2017. Doc. 255. This Order is the Court's ruling on the motions presented on March 22, 2017 but will contain references to the first trial and the evidence that was presented. Debtors appeared in person and by their attorney Michael J. Studtmann at both trials. Attorney Karin Amyx appeared for the Chapter 13 Trustee Laurie B. Williams at the first trial and Williams' successor Carl Davis at the second trial. The Internal Revenue Service appeared by Emily Metzger, Assistant U.S. Attorney at the second trial.

[4] Doc. 5.

2

Order"), increasing their monthly payments to $1,517 for 57 months.[5] At that time, this Division's standard confirmation order set out a series of duties on the debtor. The evidence shows that the Holmans flouted these duties throughout the case, especially these four. The debtors were ordered to immediately notify the Trustee of any change in employment. They were directed to timely file all tax returns coming due during the case and to provide copies of those returns to the Trustee upon request. They were prohibited from incurring any new debt during the plan without the Trustee's or the Court's approval. And, they were prohibited from selling, encumbering, or otherwise disposing of their assets without a prior court order.[6]

    I.    <u>Violations of Plan and Confirmation Order</u>

        A.  *Shala Failed to Disclose Employment Changes.*

Shala Holman lost her position as a physician's assistant in February of 2013. She applied for state unemployment compensation even though she had been working as a Rodan + Fields ("R+F") associate or consultant since 2011—a position she failed to disclose on either Schedule I or the statement of financial affairs.[7] The debtors filed at least two motions to modify that asserted Shala was unemployed, filing amended schedules I and J that also omitted her employment. The first motion (and second modification) in October 2013 stated that Shala had lost her job in February of 2013.

---

[5] Doc. 58.

[6] *See* Doc. 58, p.2.

[7] Rodan + Fields is a multilevel marketing business centering on the sale of skin care products. As a consultant, Shala is charged not only with selling products, but also with recruiting, training, and managing other consultants involved in the same pursuits. She receives an additional 5% commission on sales generated by other consultants under her.

3

The amended schedule I stated that Shala was unemployed.[8] Nathan was credited with receiving "income from Skin Care supplies" that Shala testified should have been attributed to her. She did disclose receiving unemployment. This second modification was granted by agreed order on November 18, 2013.[9]

Six months later the debtors filed their third motion to modify on May 28, 2014, again claiming that Shala was unemployed.[10] This time, they filed no amended schedules I and J. Nevertheless, this motion was also granted by an agreed order.[11]

Not until April 13, 2015 when the Holmans filed their fourth motion to modify, was Shala's R+F employment revealed. On the revised schedules I and J filed to support that motion, the debtors finally disclosed that Shala was involved in "direct sales," had been for *six* years, and was receiving $4,558 a month in commissions.[12] This modification motion went to trial in October of 2015.

    B. *The Holmans Failed to File Timely Tax Returns and Provide Timely Copies.*

Before filing bankruptcy, the debtors established an annual pattern of filing their tax returns on extension per their accountant's advice. At trial, Shala admitted failing to file the 2014 taxes by April 15, 2015 and failing to provide the Trustee with the returns. The trustee requested copies of the 2014 returns in an e-mail dated April 15, 2015. The e-mail made providing those returns a condition of agreeing to a post-

---

[8] Doc. 93.
[9] Doc. 96 (temporarily reducing for 6 months the payment from $2,035 to $1,000).
[10] Doc. 112.
[11] Doc. 118 (continuing the reduced $1,000 payment for another 6 months).
[12] Doc. 135.

4

confirmation modification that debtors were seeking.[13] The Holmans' counsel supplied the Trustee with a copy of the debtors' 2014 return extension on May 5. Then the debtors sent the Trustee a copy of the 2014 return signed as of June 22, 2015.[14]

Meanwhile, the debtors had filed their fourth motion to modify on April 13, 2015.[15] The Trustee contested the modification and, shortly before a hearing on that matter was to take place, the debtors filed their fifth motion to modify on October 12, 2015.[16] Both modification motions were resolved by an Agreed Order entered on December 2, 2015 that provided, in part, that "to resolve the Trustee's lack of good faith objection to confirmation of their modified Plan," the debtors would not reduce the dividend payable to the unsecured creditors to pay any § 1305 claims, including those of the taxing authorities.[17] Presumably, this Agreed Order resolved any outstanding demand for the 2014 returns. The parties stipulated that the debtors filed this return on October 9.

The Trustee requested copies of the debtors' 2015 tax returns by emails sent March 14 and March 28, 2016.[18] The March 14 email requested production of the tax returns not later than May 1. Trustee's counsel followed up on March 28 and, apparently hearing nothing, filed a formal motion to compel production of the returns on May 17.[19] Trustee Williams withdrew that motion on July 13, suggesting that the

---

[13] See Ex. O.
[14] See Ex. P (owing $21,693 with estimated tax penalty).
[15] Doc. 133.
[16] Doc. 165. Trial was set for October 13, 2015 and went forward on that date at the insistence of counsel for both sides.
[17] Doc. 180.
[18] Ex. V.
[19] Doc. 188 (Ex. W).

5

returns had finally been supplied. The debtors' 2015 return reflects that they signed and electronically filed it on June 30, 2016, but they later stipulated that this return wasn't actually filed until September 18.[20]

## C. *The Holmans Incurred Unauthorized Post-Petition Debts.*

The Holmans stipulated that they failed to pay federal income taxes that accrued post-petition.[21] They owe at least $24,223 for 2014 and $27,746 for 2015.[22] On February 16, 2017, the debtors filed their 2016 return, adding an additional liability of $23,799.[23] In short, during their last three years in chapter 13, these debtors racked up over $75,000 in federal income tax liability without either the leave of the court or the Trustee.[24] But these are not their only unauthorized post-confirmation debts.

## D. *The Holmans Acquired and Encumbered Assets without Court Approval*

In June of 2014, the debtors decided to give their son a car for his sixteenth

---

[20] *See* Ex. X (owing $25,391 with estimated tax penalty). Shala testified at trial they had to refile their 2015 return due to Nathan's identity theft problem they were alerted to by the IRS. According to the Trustee, this was the first time debtors mentioned identity theft as the excuse for the delay in providing their 2015 returns.

[21] In addition to the evidence admitted at trial, the Holmans, the IRS, and the Trustee entered into a stipulation of facts regarding the filing of post-petition federal income tax returns, the amount of federal income tax liability, and any payments made by the Holmans to the IRS for tax years 2014, 2015 and 2016. *See* Doc. 254.

[22] *See* Doc. 254, ¶s 3, 5 (tax liabilities as of February 13, 2017, plus interest and penalties thereafter). Prior to this, the Holmans accrued a $22,625 income tax liability for tax year 2011 that necessitated their first post-confirmation plan modification in November of 2012 and increased their plan payment to $2,035. Doc. 67.

[23] Doc. 254, ¶ 7.

[24] When Trustee Williams resolved her objection to the debtor's fifth modified plan with the proviso that the debtors would not reduce their dividend to the general creditors by paying any post-petition taxes, she arguably acquiesced in their having incurred these taxes. That said, the spirit of the confirmation order appears to have been breached.

6

birthday. They asked Sandra Woodward, Shala's mother, to borrow the money so they could buy him a 2012 Jeep Liberty. The vehicle was titled in Ms. Woodward's and Nathan's names. Though Ms. Woodward signed the note, Shala was responsible for making the payments and did so from her income.

As discussed at the 2015 hearing, Shala bought a new Lexus sport utility vehicle in 2015. R+F gives Shala a $750 monthly car allowance that is earmarked to pay for the car. Her father borrowed to pay for the car and she titled in his name "due to the bankruptcy." She gives him the car allowance every month to pay the loan. Shala did not seek either the Trustee's or the Court's permission to get the Lexus.

On August 1, 2016, Shala incorporated a subchapter-S entity, Empowering Together, Inc. (ETI), also without Court or Trustee approval.[25] She testified that she did this to better organize her business affairs and to save taxes.[26] Then, on August 11, Shala and ETI applied for a residential lease agreement with Watercrest at City Center Apartments in Lenexa, Kansas, and executed the lease on September 20.[27] Shala testified that this apartment was necessary for her to entertain clients and train other consultants in the course of her R+F employment. Shala agreed at trial that she didn't obtain the Trustee's permission and that this action violated the confirmation order, but excused this by stating that when she applied to get the

---

[25] Ex. QQ.

[26] The Court notes that, in 2016, members of Kansas sub-chapter S corporations were exempt from paying Kansas income tax on income that passed through the entity to them. *See* KAN. STAT. ANN. § 79-32,117(c)(xx) (2016 Supp.) (Such income is deducted from a taxpayer's federal adjusted gross income to determine the taxpayer's Kansas adjusted gross income).

[27] Ex. RR. The base rent was $1,013, plus monthly rent of a garage ($135) and a monthly pet fee for Shala's two bulldogs ($50). As part of the lease transaction, the Holmans also incurred a $170 premium for required renter's insurance.

7

apartment, she believed none would be available until the debtors had completed their chapter 13 case in January of 2017. Both the incorporation and the lease were done in August-September of 2016, *after* the Trustee moved to dismiss on July 26.[28]

II.   <u>Lack of Good Faith</u>

The Trustee also argued that the Holmans filed and prosecuted their case in bad faith that is cause to dismiss under § 1307(c). The Holmans have been less than forthcoming in two particular areas: their income and employment status and their bank accounts.

A. *Pattern of Failure to Disclose Current Income*

Twice in modification motions and their supporting income and expense schedules, Shala contended that she was unemployed and only receiving unemployment compensation. In both motions, debtors sought to temporarily reduce their monthly plan payments to $1,000 due to Shala's alleged unemployment. She first made this claim in October of 2013 when she had been selling R+F for nearly two years—indeed before the case was filed. [29] On the Schedule I filed on October 21, 2103, Nathan reports monthly income of $1,221 as "Income from Skin Care supplies [sic]."[30] Shala only reported receiving unemployment. Though the October Schedule I discloses no R+F income for Shala, she actually received over $30,000 that year, averaging $2,500 a month.[31]

---

[28] Doc. 196.
[29] Doc. 91 ("Joint Debtor lost her job in February 2013 and has been unable to obtain employment.").
[30] Doc. 93.
[31] Ex. NN.

8

When the debtors filed their third modification motion in May 2014, seeking to continue the reduced plan payments, Shala again claimed unemployment.[32] The debtors filed no amended schedules I and J this time, but the Trustee consented to the modification. The Court entered an agreed order modifying the plan on August 19, 2014.[33] Schedule C of the debtors' 2014 tax return reflects that Shala generated net profit that year of $38,342 or an average of $3,195 a month.[34] Their contemporaneous representation that they needed another six months of payment relief to allow Shala to get work was simply false.

On April 13, 2015, debtors filed their fourth motion to modify, asking to permanently reduce their plan payments to $1,025 based on a "drop in income."[35] They submitted profit and loss statements and amended Schedules I and J.[36] The Court opened an evidentiary hearing on this motion on October 13, 2015, one day after the debtors filed their *fifth* motion to modify.[37] In the fifth motion, they represented that their income had changed again and sought to *increase* their monthly payment to $3,080 for the duration of the plan.[38] The April Schedule I had disclosed that Shala's business income was $4,558 per month, and noted that

---

32 Doc.112 ("Joint Debtor lost her job in February 2013 and has been unable to obtain employment.").

33 Doc. 118.

34 Ex. P, p. 126. Likewise, Shala's R&F earnings records show she received $58,729 in 2014, or an average of $4,894 per month. *See* Ex. OO.

35 Doc. 133.

36 Doc. 135.

37 The parties agreed to go forward with the hearing anyway.

38 Doc. 165. Although proposing an increase of over $2,000 in the monthly plan payment, the debtors' fifth motion recited, like the fourth motion, a "drop in income."

9

Nathan's income was down to $2,830 per month.[39] By contrast, the Holmans' 2015 tax return shows that Nathan *profited* from his chiropractic practice by $52,703. Shala realized $66,072, making her average monthly *net* income $5,506, not the $4,558 she reported.[40] Again, the Holmans understated their income.

Around the time of the October 13, 2015 hearing, the debtors filed several separate schedules I and J. The inconsistent information these documents contained unduly complicated the resolution of the fourth and fifth modifications. Before the October 13 hearing, the debtors filed an amended schedule J without a schedule I.[41] There they reported combined income of $9,211. Only after they filed their fifth modification did they file a schedule I. It reported their combined income as $10,788.[42] Subtracting the previous schedule J expenses of $6,063 yields a disposable income amount of $3,523. After the Court reopened the evidentiary hearing to consider the fifth motion, the debtors filed another schedule J, this one showing disposable income of $3,522.[43] On December 2, 2015, the Trustee and the debtors agreed to an order that granted the fifth modification motion and "resolved" the Trustee's lack of good faith objections to the fourth and fifth motions. [44]

---

[39] Doc. 135.
[40] *See also,* Ex. X, pp. 171, 173.
[41] Doc. 161.
[42] Doc. 172. Shala's 2015 earnings records from R&F show that she alone grossed $126,729, or on average $10,562 per month. *See* Ex. OO.
[43] Doc. 178.
[44] Doc. 180 (hereafter "Agreed Order"). The resolution provided for debtors to make a $3,522 monthly plan payment for 3 months starting in December 2015 and beginning in March 2016 pay $4,725 for the remaining 9 months of their plan.

10

B. *The Holmans Failed to Disclose Bank Accounts.*

The Holmans failed to disclose bank accounts, both at the time of the initial filing and later. Based on the Trustee's exhibits and Shala's testimony, the following accounts were not disclosed—

- Intrust Bank x9233—this was Nathan's small business checking account that, according to Shala, he opened on September 12, 2011 after closing a similar business account at Commerce Bank, x4603.
- Commerce Bank x4603—Debtors scheduled this account as having a -0- balance at filing. If it was closed before the case was filed, that statement was at least partially accurate.
- Commerce Bank x5972—Shala explained that this was Nathan's son Aaron's student checking account. They were signatories, so it should have been disclosed.
- Commerce Bank x0886 "Holman Marketing"—Nathan used this account to purchase postcards and other marketing items for his practice; Shala testified she thought the account had previously been closed.
- Intrust x5077—Shala testified this was Nathan's account to which she was added in February of 2012, after filing. It was not disclosed to the Trustee until the present motion was filed.
- Intrust x6208—Shala testified that this was her business account for R+F work and was opened in December of 2011.
- Intrust x5612—Shala testified that this account is hers and their son Skylar's, opened in 2013. She testified that he, too, is an R+F consultant.
- Intrust x9342—this was the son's savings account, opened in August of 2013 upon which Shala was a signer. It has since been closed.
- Intrust xx 7970—Shala stated this was an account of hers and her mother's Ms. Woodward, opened in June of 2014 to pay the Jeep payments and in which Shala parked about $4,000 for 2016 taxes. She stated she had not used this account for her business.
- Intrust x9932—this is ETI's corporate account, opened on August 2, 2016.

At trial, Shala conceded that none of these accounts was ever disclosed.

C. *The Holmans Indulged in Excessive Lifestyle Expenditures.*

While the debtors were trying to reduce their plan payments, they underreported income and spent excessively. Some examples of this include the son's

jeep, Shala's 2015 Lexus, trips taken by members of the Holman family, their four Kansas City Chiefs season tickets, and the Lenexa apartment ETI rented in 2016.

As discussed at the 2015 hearing and again above, Shala bought a new Lexus sport utility vehicle in 2015, but her father borrowed to pay for the car and she titled in his name "due to the bankruptcy." She pays for the loan. Likewise, the debtors masked the acquisition of their son's birthday Jeep by placing the car and the loan in Shala's mother's name. Nathan drives a Denali that Shala says they bought from Ms. Woodward. That vehicle was not listed on the schedules, suggesting it was purchased after the filing. These cars were part of the Trustee's 2015 good faith objection that has since been resolved.

Shala and Nathan traveled to Mexico for her 40th birthday in 2013. She claimed this was also a work trip. In 2016, they visited their daughter in New York City, conducting a garage sale to raise enough to pay for airfare for one of them. This past summer, Shala attended an Adele concert in Denver—her sister gave her the tickets and the family drove there. Their son's senior trip took him to Paris, France, but Shala testified he paid the cost of the trip himself over 15 months with odd jobs. On balance, these travels do not seem extravagant.

Much of Shala's personal finances are bound up in her business. That includes her bulldogs' veterinary bills; she says they feature in her R+F promotional materials. R+F also sends Shala on business trips. ETI rented the Lenexa apartment to provide her a Kansas City area platform for her R+F work which includes training the 1,400 consultants under her. Shala also hired an assistant who works out of the apartment.

12

The apartment rents for about $1,200 per month. No doubt the apartment makes it easier for the Holmans to use their Chiefs tickets which, Nathan testified, are the least expensive tickets available and cost about $2,700 a year. At the October 2015 hearing, Nathan testified that these tickets were a business expense and that he uses them to reward other professionals for referrals and has done so since 2003. Presumably, Shala can use them in a similar fashion.

The debtors also continue to own and pay the first mortgage on their home in Wichita, having cured a default on that mortgage during this case.[45] In May of 2015, around the same time that debtors filed their fourth modification, their mortgage lender filed a motion for relief from the automatic stay; at that time debtors had missed five mortgage payments and were in arrears over $15,000.[46] The debtors agreed to make additional payments to cure the mortgage arrearage.[47]

### D. *Nathan's Work; Division of Financial Responsibility.*

Nathan and Shala both testified that while he devotes his time and attention to being a chiropractor, she is in charge of the family's financial affairs. Chiropractic practices have suffered in the past 20 years because health insurers pay far less for chiropractic treatments than before and patients must pay more out-of-pocket for

---

[45] They stripped a second lien securing a $212,400 debt on their 5,100 square foot home early in the case. Their first mortgage at the time of filing was more than $348,000. Doc. 16. The monthly payment on the first mortgage was over $4,800 at the time of filing and pursuant to a loan modification effective October 15, 2012, the principal balance was increased to $408,213 to include debtors' outstanding arrearage and the monthly payment was reduced to $3,099 payable over 480 months. Doc. 78. Debtors were making their monthly mortgage payments directly to the lender.

[46] Doc. 140.

[47] Doc. 154.

13

treatments that results in scheduling more infrequent treatments. Nathan said his income had dropped by some $70,000 a year by the time he filed here. Asked why he did not support selling the debtors' home to reduce debt, Nathan testified that the family had lived there since 1997, he wanted his children to grow up there, and that he had cured the defaults through the chapter 13 plan. He testified that during the case, the Holmans sold most of their furniture to make plan payments in 2012-2013 and that they could not afford even rudimentary home repairs. As a result of a post-petition mortgage modification with Bank of America, their house payment was reduced from $4,812 to $3,099 a month and paid outside the plan. This, too, is ground that was covered at the October 2015 hearing as part of the Trustee's now-resolved lack of good faith objection.

Shala testified that in 2016, the couple changed accountants, hiring an accounting service in Las Vegas to assist them with taxes going forward and to restructure Shala's business into a sub-S corporation. They have also hired Polston Tax Resolution to represent them before the IRS. These professionals have proposed offers in compromise to the IRS, but those offers are in limbo pending the end of this bankruptcy case.[48]

Both debtors testified that they had learned and grown through the bankruptcy process. They have now structured their affairs so that they can resolve and continue to pay taxes on a current basis. Nathan seemed withdrawn from the

---

[48] The Court notes that the IRS is reluctant to negotiate with debtors while still in bankruptcy.

14

family's financial details and Shala dismissed the debtors' many disclosure errors and misstatements, preferring to focus on the couple's attempts to master their finances.

    III.   <u>Status of the Case: Payments Completed</u>.

    In December of 2015, the Trustee agreed to resolve her objections to the proposed fourth and fifth modifications in exchange for the debtors' agreement to make monthly payments of $3,522 from December 2015 through February 2016, increasing to $4,725 for another nine months until $109,107 had been paid under the plan.[49] On July 26, 2016, the Trustee filed her second motion to dismiss based on the debtors having defaulted on their payment obligations and also upon their failure to pay post-petition taxes.[50] The United States filed its own dismissal motion on August 23, 2016.[51] Trustee Williams resigned on October 1, 2016 and Trustee Carl B. Davis entered his appearance in the case. He twice amended the prior dismissal motion to assert that the debtors had proceeded in bad faith and to ask for a conditional dismissal as § 349(a) provides.[52] Debtors completed their plan payments in December 2016 by making their final payment while awaiting the hearing on these motions.[53] After discovery through the end of 2016 and the beginning of this year, the parties came to trial on these motions, as supplemented by the Trustee's bill of particulars, on March 22, 2017.[54]

---

[49] Doc. 180, Agreed Order.

[50] Doc. 196.

[51] Doc. 200.

[52] Doc. 212 and 241.

[53] *See* Ex. TT and UU. The Trustee's interim report as of November 18, 2016 showed that approximately $7,804 was needed to complete the plan. Doc. 231.

[54] Doc. 248.

15

<u>Analysis</u>

The United States requests that the case be dismissed for cause, asserting that debtors are funding their plan by incurring and not paying post-petition income tax liability without approval of the Court or Trustee. The Trustee asks for the same relief and asserts debtors' bad faith as an additional basis for cause, plus a conditioned dismissal under § 349 that would not only bar the Holmans from filing another case for 180 days under § 109(g)(1), but would also bar the future discharge of any of the debts scheduled in this case. Both parties request that I dismiss this case without entering a discharge order. Given the amount of money they have paid, that would be a draconian remedy—the bankruptcy equivalent of the death penalty.

I.     <u>Dismissal for Cause under § 1307(c)(1) and (6)</u>

There is ample cause to dismiss this case. Section 1307(c) provides an inclusive list of examples of "cause," two of which particularly apply in this case—

> (c) Except as provided in subsection (f) of this section, on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, including—
>
> > (1) unreasonable delay by the debtor that is prejudicial to creditors; [or]
> >
> >                        * * *
> >
> > (6) material default by the debtor with respect to a term of a confirmed plan; * * *.[55]

---

[55] 11 U.S.C. § 1307(c)(1) and (6).

16

The record shows that the Holmans repeatedly violated the Confirmation Order and plan. The Confirmation Order outlines the debtors' duties and requirements. Many courts hold that continuing violations of these "duties orders" warrant dismissal. "Failure of the debtor to comply with local rules and 'duties orders' that require such things as the filing of tax returns is cause for dismissal."[56] The Holmans' duties were explicit. They were to (1) keep the court apprised of changing employment;[57] (2) not incur additional debt;[58] (3) not sell or dispose of any assets;[59] and (4) timely file all tax returns that become due, providing a copy to the chapter 13 Trustee when filed and if requested.[60] The facts reflect their utter disregard of each of these duties.

As detailed above, Shala Holman misrepresented her employment status for several years. Though she notified the Trustee that she had lost her job at the Kansas Medical Center when they filed their second motion to modify in 2013, she did not

---

[56] Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY, 4th Ed., § 334.1, at ¶ 334.1, Sec. Rev. June 16, 2004, www.Ch13online.com. *See In re Nygaard*, 213 B.R. 877 (Bankr. M.D. Fla. 1997) (Cause for dismissal that debtors failed to file tax returns as required by preconfirmation order concerning the filing of tax returns routinely entered in Chapter 13 cases.).

[57] Doc. 58, p. 2 ("IT IS FURTHER ORDERED that should the Debtor(s) change either his address or employment, the Debtor(s) shall immediately notify the Court and the Trustee of same, in writing.").

[58] *Id.*, "IT IS FURTHER ORDERED that the Debtor(s) shall not incur any additional debts during the pendency of the plan without prior approval by the Court or by the Trustee, except debts that may be necessary for the protection and preservation of the life, health or property, such as food, clothing, lodging or medical care for the Debtor(s) and family."

[59] *Id.,* "During the pendency of this case, Debtor(s) is enjoined and prohibited from selling, encumbering, or in any manner disposing of assets without prior order of the Court, except as may be required in the course of Debtor's business, if Debtor(s) is engaged in business."

[60] *Id.,* "IT IS FURTHER ORDERED that the Debtor(s) shall timely file all tax returns that become due during the pendency of the case, and provide a copy to the Trustee at the same time the return is filed, if requested by the Chapter 13 Trustee."

17

disclose her ongoing work for R+F, until 2015, when the debtors filed their amended schedules in support of the *fourth* motion to modify, nearly three and one-half years after the petition date.[61] Her facile explanation that her R+F income was incorrectly attributed to Nathan might wash had it only happened once. It didn't.

The Holmans incurred many post-petition debts without Trustee or Court approval, some that appear to have been actively concealed. First, there are the taxes. The Holmans concede that they owe the Internal Revenue Service federal income taxes of $24,223 for 2014, $27,746 for 2015, and $23,799 for 2016.[62] Despite generating adjusted gross income in each of those years in excess of $100,000, the debtors only paid the taxing authorities about $3,400.[63] They will exit bankruptcy having paid $109,107 into their plan, but still owing the United States over $75,000.

At least the tax debts came to light when the debtors produced their returns. Not so with the Jeep and Lexus loans that they incurred through others without getting the Trustee's or the Court's approval. At trial, Shala explained these actions away as being necessary "due to the bankruptcy." Nor did the debtors ever disclose that Nathan acquired the Denali he drives from Shala's mother or how that vehicle is titled.

---

[61] *See* Docs. 91, 135.

[62] Doc. 254.

[63] Based upon the March 2017 stipulation Doc. 254 debtors have paid $1,000 on 2016 taxes (in 2017 when filed), $0 on 2015 taxes, and $1,000 on 2014 taxes (in 2016). In addition they have submitted $1,400 in 2017 under a yet-to-be-approved installment agreement with the IRS. The $1,000 payment on the 2014 taxes appears on Exhibit 2, the tax transcript. Exhibit 4 reveals that the two $700 payments made in 2017 in support of the proposed installment agreement were actually applied, one to 2014 and the other to 2015.

18

The debtors also disposed of assets in violation of the confirmation order. Each undisclosed car loan involved encumbering assets of the estate. So did Shala's incorporation of her business. When she formed ETI, she transferred her business and its assets to it in exchange for her equity. ETI's 2016 Form 1120S return show Shala's Lexus and the ETI lease on the depreciation schedule.[64] Shala's commission income is now attributed to the corporation. No doubt incorporating a business has many salutary tax and organizational efficiencies, but the confirmation order required Shala to get the Trustee's permission to do it. She didn't.

The Lenexa residential lease violated several confirmation order injunctions. The debtors didn't seek the Trustee's or the Court's approval. The Holmans already have a large home in Wichita, so the apartment couldn't be necessary "for the preservation of life, health, or property," an exception to the requirement of Trustee or Court approval.[65]

Finally, the Holmans had to be prodded to comply with the duty to file and turn over their tax returns. They did neither without the Trustee going to considerable effort, including the filing of a motion to compel.

Any of these plan or confirmation order violations provide cause to dismiss this case. Here the violations are many and some appear to have been concealed from the Trustee. That alone would be sufficient cause to dismiss the case under 11 U.S.C. § 1307(c)(6).

---

[64] Ex. XX, p. 933.
[65] *See* Doc. 58, p. 2, conditioning the proscription on new debt.

19

II.    <u>Lack of Good Faith as Cause to Dismiss under § 1307(c)</u>

Bad faith is not included in the statutory exemplars of what constitutes cause for dismissal, but § 1307(c)'s list is inclusive, not exclusive.[66] Certainly bad faith conduct amounts to unreasonable delay that would fall within § 1307(c)(1)'s ambit, too. In *In re Gier*, the Tenth Circuit Court of Appeals held that "the bankruptcy court must consider the 'totality of the circumstances,'" when considering whether a debtor filed a chapter 13 case in bad faith.[67] The *Gier* panel cited to Seventh Circuit authority in *In re Love* that invoked a "nonexclusive list of factors relevant to a § 1307(c) inquiry," a list that is very similar to the Tenth Circuit's *Flygare* factors that courts use to discern whether a debtor's plan has been proposed in good faith under § 1325(a)(3).[68] The *Love* list includes:

> the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the

---

[66] "Cause" under § 1307(c) is not defined nor limited to the conduct enumerated therein. *See* Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY, 4TH EDITION, § 333.1, at ¶1, and § 334.1, ¶ 5, Sec. Rev. June 16, 2004, www.Ch13online.com (hereafter "CHAPTER 13 BANKRUPTCY").

[67] *Gier v. Farmers State Bank (In re Gier)*, 986 F.2d 1326, 1329 (10th Cir. 1993).

[68] *Flygare v. Boulden*, 709 F.2d 1344, 1347-48 (10th Cir. 1983) (citing with approval list of factors from *United States v. Estus (In re Estus)*, 695 F.2d 311, 317 (8th Cir. 1982)), *superseded by statute as stated in Anderson v. Cranmer (In re Cranmer)*, 697 F. 3d 1314, 1319 n. 5 (10th Cir. 2012) (because BAPCPA specifies that social security income benefits are excluded from the calculation of disposable income, court could not consider the exclusion of social security income in the good faith analysis under § 1325(a)(3); § 1325(b) as amended subsumes the ability to pay factors and narrows the good faith inquiry). *See* CHAPTER 13 BANKRUPTCY, § 334.1, ¶ 6 (A bad faith dismissal under § 1307(c) employs the same analysis of good faith required for confirmation under § 1325(a)(3), except the creditor or trustee has the burden of proof.).

20

debtor has been forthcoming with the bankruptcy court and the creditors.[69]

There are many cases dealing with dismissal of chapter 13 petitions for debtor's bad faith.[70] Many of them address serial filings and simultaneous filings in different chapters or different courts, while others speak to in-case conduct by the debtors. The debtor's confirmation order violations discussed above also implicate the *Flygare* factors. The bottom line in a lack of good faith inquiry is whether the totality of the circumstances suggests that the debtors abused the provisions, purpose, or spirit of the Code both before and after December 2, 2015, the date of the Agreed Order confirming the fifth plan modification.[71]

The many troubling circumstances here include the debtors' misreporting or concealment of income, new debt, and asset acquisition and disposition from the Trustee. While the Holmans paid $109,107 into their plan by the end of their 60 month plan term, their income dramatically increased, raising the question whether they could have or should have paid more.[72] Their repeated inaccurate statements concerning their debts, income, and expenses suggests something beyond

---

[69] *In re Love*, 957 F.2d 1350, 1357 (7th Cir. 1992).

[70] *See e.g.*, CHAPTER 13 BANKRUPTCY, App. O, *Bad Faith Dismissal, Organized by Circuit*, www.ch13online.com.

[71] Doc. 180. *See In re Gier,* 986 F.2d 1326, 1329 (totality of circumstances inquiry for § 1307(c) dismissal best assists the court's determination whether there has been an abuse of the provisions, purpose, or spirit of chapter 13); *Flygare v. Boulden,* 709 F.2d 1344, 1347, *quoting In re Estus,* 695 F.2d at 316; *In re Wareham*, 553 B.R. 875, 879-80 (Bankr. D. Utah 2016).

[72] This question is fostered by a review of Shala's R&F earnings records that the Trustee subpoenaed in late 2016. *See* Ex. OO (2013) and Ex. NN (2014-2016). For 2016, through September, Shala received $169,390 in commissions in that 9-month period, or an average monthly gross of $18,821. Ex. OO.

21

inadvertence. They failed to disclose bank accounts, cars, employment, income, expenses, the lease, and the corporation "because of the bankruptcy." Even after the fifth modification was approved, and while the Trustee's second dismissal motion was pending, Shala organized ETI, established an ETI bank account (transferring assets into the account), leased the Lenexa apartment and spent $8,000 furnishing it.

The Holmans used chapter 13 to drastically modify their home mortgage loans. They live in a 5,100 square foot, 5 bedroom house on a half-acre lot. They scheduled this home with a value of $340,000 at a time when Sedgwick County valued it at $487,200 for *ad valorem* tax purposes. They leveraged that lower value to slice off Cenlar's $212,400 second lien, then they effected a loan modification of the first mortgage in 2012 that reduced their monthly mortgage payment by $1,700. Even after obtaining substantial mortgage debt relief, they still failed to pay current three years of post-petition federal income taxes.

These actions suggest that the debtors lack motivation and sincerity.[73] They demonstrated disregard for the bankruptcy process and the Court's orders and abused the provisions, purpose, and spirit of chapter 13. Though this also supplies ample cause to dismiss their case, two matters prevent that.

First, the Trustee challenged most of the debtors' bad faith conduct at the October 2015 trial. After presenting evidence concerning those objections, the parties agreed to an order that states in part—

> 3.    *To resolve the Trustee's lack of good faith objection to confirmation of their modified Plan*, Debtors herein agree that the dividend to their

---

[73] *Flygare,* 709 F.2d at 1348 (debtors' motivation and sincerity among the factors to be considered in determining whether there is a lack of good faith).

general unsecured creditors shall not be reduced to pay any post-petition 11 U.S.C. § 1305 claim, including that of any taxing authority.[74]

The Agreed Order stated that the debtors had paid $56,016 into the plan through November 20, 2015 and that they agreed to pay three monthly payments of $3,522 followed by nine monthly payments of $4,725 to complete it. They did that, paying $53,091 in twelve months' time for a total of $109,107, the agreed base amount.

The Trustee filed a "2nd Motion to Dismiss" on July 26, 2016.[75] In that motion, the Trustee alleged that the debtors were $7,804 in arrears under the Agreed Order and had failed to file their 2015 tax returns.[76] In response, the debtors agreed to file their 2015 return immediately and promptly catch up their payments.[77] They did both. Not until August 23, 2016 did the United States file its motion to dismiss for failure to pay their 2014 taxes and to file the 2015 return.[78] In short, the debtors complied with their payment obligations under the Agreed Order, catching up the $7,804 delinquency and paying the total base of $109,107 over the life of the plan.[79] They filed their 2015 tax return on September 18, 2016.[80]

To allow the Trustee to reopen the bad faith issues that arose before December 2, 2015 would be the equivalent of revoking the Agreed Order that confirmed the fifth

---

[74] Doc. 180. Emphasis added.

[75] Doc. 196. That motion was preceded by the Trustee's Motion to Compel Production of debtors' 2015 tax returns on May 17, 2016, after having requested those returns twice previously in March of 2016. *See* Doc. 188.

[76] Doc. 196.

[77] Doc. 199.

[78] Doc. 200.

[79] *See* Ex. TT and UU, showing completion of plan payments with a final payment on December 15, 2016 and a total of $109,107 paid in.

[80] *See* Doc. 254.

Case 11-13418   Doc# 257   Filed 05/09/17   Page 23 of 28

modification. A court may revoke a confirmation order only if it was "procured by fraud," and then only after a party in interest files an adversary proceeding within 180 days of the order's entry.[81] Even if the Agreed Order had been procured by fraud, the Trustee's dismissal motion filed July 26, 2016, some 237 days after the Agreed Order. It is too late to reconsider or revoke what the parties agreed to on December 2, 2015,[82] even though bad faith and other issues arising out of the ETI incorporation, the Lenexa residential lease, and the continuing pattern of nonpayment of taxes would remain in play were the plan payments not complete.

The completion of payments presents the second and taller barrier to dismissal. While dismissal is discretionary, the Court's duty to enter a discharge upon payment completion is not. Section § 1307(c) states that the court "may" dismiss a case for cause, but § 1328(a) states that once payments have been completed and certain other requirements have been met, "the court *shall* grant the debtor a discharge…"[83] The time in which to except a debt from the Holmans' discharge has long passed.[84]

*In re Parffrey* is a very similar case.[85] That debtor failed to file tax returns or pay income tax throughout his chapter 13 case, but when the United States filed its dismissal motion, he paid off his plan and demanded a discharge. Recognizing that

---

[81] § 1330(a).

[82] Fed. R. Bankr. P. 7001(5) requires this relief to be sought in an adversary proceeding, not a contested matter. Note, too, that Fed. R. Bankr. P. 9024 which makes Fed. R. Civ. P. 60 applicable in bankruptcy cases and proceedings expressly provides that revocation complaints must be filed within the time set out in § 1330.

[83] § 1328(a).

[84] Fed. R. Bankr. P. 4007(c).

[85] 264 B.R. 409, 414 (Bankr. S.D. Tex. 2001).

24

at least one other judge had dismissed a case after payment completion,[86] the *Parffrey* court concluded that it lacked discretion to deny the debtor a discharge even though the debtor had violated the "duties order." In *Parffrey*, the debtor had failed to file three post-petition income tax returns despite receiving more than one million dollars in gross receipts during that period. The form confirmation order used in the *Parffrey* case did not provide for dismissal as a consequence of incurring post-petition debt. Like the confirmation order in our case, the *Parffrey* order merely warned that unauthorized post-petition debt might not be dischargeable under § 1305. The *Parffrey* court noted that in later cases, it had begun to issue an order that expressly provided that the debtor should file tax returns timely, just as the District of Kansas order does. The court also noted that Parffrey's taxes were his liability alone; only if the IRS opted to seek administrative status under § 503(b) or post-petition treatment under § 1305 would the claims receive any distribution in his chapter 13 case. As in this case, the IRS did neither in *Parffrey*.

The *Parffrey* court concluded that despite having clear grounds to dismiss the debtor's case, it lacked discretion to deny him a discharge because "Congress did not see fit to give bankruptcy judges discretion on this point."[87] The court noted that the drafters' used the mandatory "shall" as opposed to the discretionary "may" and concluded that "the words of a statute are not to be disregarded in search of equity…"[88] Indeed, as Judges Lundin and Brown have written—

---

[86] *In re King*, 217 B.R. 623 (S.D. Cal. 1998) (Case dismissed when debtor failed to pay § 1305 tax claim even after IRS filed it).

[87] 264 B.R. 409, 414.

[88] *Id., quoting United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989).

Once the Chapter 13 debtor has completed payments under the plan and is entitled to discharge under § 1328(a), it will be truly unusual facts to justify dismissal with prejudice under § 349(a). It has been held that entry of discharge in the Chapter 13 case renders moot a motion to dismiss filed, but not decided, earlier in the Chapter 13 case.[89]

In our case, the Holmans continued paying while the Trustee continued discovery. After these motions had been set for a November 15, 2016 evidentiary hearing, on November 7 the Trustee and IRS jointly requested that the hearing be continued to allow for more discovery.[90] The Holmans have not yet requested a discharge, but unless they owe domestic support or are otherwise disqualified from receiving one, § 1328(a) requires me to grant them one. Had I the discretion to deny a discharge and dismiss this case, I would. As it is, the debtors completed their plan payments and I lack the discretion to dismiss this case in spite of their conduct.

That discharge will not solve all of the Holmans' problems. For one, they will remain liable for the post-petition income taxes they've incurred. The IRS did not file a § 1305(a)(1) proof of claim for those taxes. They were not incurred by, nor were they payable by the estate and the taxes are excepted from administrative tax treatment by § 503(b)(1)(B)(i).[91] These taxes will not be discharged. Nor will any other post-

---

[89] CHAPTER 13 BANKRUPTCY, § 343.1 at ¶ 37, Sec. Rev. July 22, 2004, www.Ch13online.com. *See also Forbes v. Forbes (In re Forbes)*, 218 B.R. 48, 52 (8th Cir. BAP 1998) (Entry of discharge renders moot motion to dismiss pending for two years but not ruled upon by the bankruptcy court. "[T]he Bankruptcy Code required entry of the discharge and . . . Grace bears some measure of the blame by failing to press her dismissal motion. Therefore, we conclude that the bankruptcy court did not abuse its discretion in refusing to vacate the discharge order.")

[90] Doc. 220.

[91] "However, if the tax claimant chooses not to file a proof of claim under section 1305(a), the debtor cannot pay the postconfirmation income tax as an administrative expense of the estate under section 503(b)(1)(B)(i), since the taxes were not incurred by the estate." *See* 4 COLLIER ON BANKRUPTCY ¶ 503.07 (16th Ed. 2017).

petition debts the debtors incurred and for which no § 1305(a)(2) claims were filed. They will also remain personally liable for their first mortgage debt which is excepted from their discharge under § 1328(a)(1) because their plan provided for it to be paid beyond the plan's term under § 1322(b)(5).[92] Finally, the Holmans have student loan debt that will also survive their discharge.[93]

Despite being deeply troubled by the debtors' artful dodging of their duties, the Code's express language cannot be dodged. There is no discretion for the Court to "equitably" deny their discharge, and, to some degree, that is consistent with chapter 13's underlying theme that "rewards" plan completion with a much more expansive discharge.[94] Like all hard cases, this one offers several lessons. First, the bankruptcy system runs on debtor credibility. Debtors need to present information that is complete, timely, and factually accurate. Second, the bankruptcy system runs fast. Motions like these must be investigated, filed, and prosecuted more quickly than this one was. Third, the bankruptcy system runs on finality. Once a modification motion has been resolved, unless there is fraud and a timely complaint to revoke the order,

---

[92] We note that a number of courts have held that debtors who are in default on mortgages paid outside the plan under § 1322(b)(5) cannot be deemed to have completed their "payments under the plan." *See Evans v. Stackhouse,* 564 B.R. 513 (E.D. Va. 2017) (postpetition mortgage payments made directly to lender are payments under the plan); *In re Tumblson,* No. 12-80365-TRC, 2016 WL 889772 (Bankr. E.D. Okla. Mar. 8, 2016) (case dismissed for cause when debtor defaulted on direct mortgage payment though all other payments to trustee were made); *In re Formaneck,* 534 B.R. 29 (Bankr. D. Colo. 2015) (case dismissed when debtor defaulted on direct mortgage payment in 58th month of plan); *In re Gonzales,* 532 B.R. 828 (Bankr. D. Colo. 2015) (discharge vacated where debtor had made all payments to the trustee but not all direct payments to mortgage creditor). Based on the record before me, these debtors appear to be current on their first mortgage.
[93] §§ 1328(a)(2) and 523(a)(8).
[94] Compare the scope of debts discharged by § 1328(a) with that of a "hardship" discharge under § 1328(b).

that resolution closes the book on any bad faith or other conduct the Trustee may have alleged in objecting to it.

The Court DENIES the Trustee's and United States' motions to dismiss and directs the debtors to apply for a discharge consistent with the practices of this District not later than 14 days from the date of this order. Having concluded that the debtors are entitled to a discharge because they completed their plan payments and having denied his motion to dismiss, the Trustee's additional requests for a conditional dismissal and a discharge bar under § 349(a) and § 109(g) are moot.[95]

### # # #

---

[95] When the case is closed, the debtors will be barred from seeking a discharge in chapter 13 for two years, § 1328(f)(2), and in chapter 7 for six years, § 727(a)(9).